**E-FILED**
Monday, 15 May, 2006  11:20:46 AM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| ETHEL M. WOKEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )  No. 04-3128 |
| | ) |
| ST. JOSEPH PARISH, | ) |
| | ) |
| Defendant. | ) |

OPINION

RICHARD MILLS, U.S. District Judge:

This case is before the Court on the Defendant's motion for summary judgment.

I. FACTUAL BACKGROUND

A. Introduction

Plaintiff Ethel M. Woken, who worked as an eighth grade teacher at St. Joseph School in Springfield, Illinois, brought this lawsuit pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 623, et seq. ("ADEA").  She alleges that her employment with St. Joseph School was

1

terminated because of her age.

Defendant St. Joseph Parish/St. Joseph School ("the Defendant" or "the School") seeks the entry of summary judgment in its favor on the Plaintiff's complaint.  The Defendant alleges that summary judgment is appropriate in this case because the Plaintiff cannot make out a *prima facie* case under the ADEA.  Even if the Plaintiff were able to assert a *prima facie* case, moreover, the School claims that it has articulated several legitimate, non-discriminatory reasons for its decision not to offer her a contract.  The School contends that the Plaintiff is unable to show that its proffered reasons were a pretext for age discrimination.

Plaintiff Ethel Woken, who was born on April 26, 1947, worked as an eighth grade teacher for the School from August 1987 to May 1, 2003. During her employment, the Plaintiff always worked pursuant to an annual teacher contract.  The annual contracts were not guaranteed year to year (August 15 to June 15), and did not automatically renew.

Father Tom Holinga, who was born in 1948, has been the Pastor of St. Joseph's Parish since July 2002 and has been affiliated with the

2

Springfield Diocese for more than 31 years.  As pastor, Father Holinga is responsible for the administration of the parish, which includes the School. Jennifer Burke, who was born in 1970, has been the principal of the School since 1996.  The school principal reports to the parish pastor, who in turn relies on the principal to operate the school and report any concerns or problems to him.  Theresa Hansen has been employed as the school counselor for the Defendant since 1996.  Ms. Hansen is a licensed clinical social worker with a bachelor's degree in psychology and sociology, and a master's degree in social work.

The Plaintiff claims that she was not offered a teaching contract for the 2003-04 school year because of her age.  She claims that Ms. Burke and Father Holinga discriminated against her on that basis.  The Plaintiff was never subjected to any derogatory or negative comments based on her age.

B. Plaintiff's duties, responsibilities and performance expectations

The Plaintiff and other teachers are required to follow the policies and procedures set forth in the St. Joseph School Faculty Staff Handbook and in the Diocesan Handbook of Catholic Education.   The Plaintiff's job

description contained in documents identified as DEF 91-93 accurately describes her duties and responsibilities as an eighth grade teacher for the School.  According to the job description, the Plaintiff's responsibilities included: motivating and involving students in activities; conducting periodic evaluations; counseling pupils as needed; discussing academic and social progress with parents; keeping required records; participating in professional activities of the school and in-service programs; performing extra-curricular duties related to her position and other duties as assigned. The Defendant alleges that for the 2002-03 school year, the Plaintiff had an attachment to her contract outlining additional performance requirements, which she accepted and agreed to.[1]

The Plaintiff's performance evaluations also stated requirements and expectations for her performance.  The Plaintiff and other teachers received year-end evaluations rating their performance in six areas: Catholic identity; personal/professional characteristics; classroom management; instructional

---

[1]The Plaintiff disputes this allegation regarding her contract.  While acknowledging that she had an attachment to her contract, the Plaintiff does not agree that she was in agreement with the attachment.

4

skills and practices; administrative/staff relationships; and professional development.

C. Plaintiff's performance during 1999-2000

The Defendant alleges that according to Ms. Burke's observation, the Plaintiff's performance began to decline in the 1999-2000 school year. The Plaintiff disputes that her performance declined. Specifically, the School asserts that Ms. Burke observed changes in the Plaintiff's teaching style, ability and emotional stability, and also observed that Plaintiff's rapport with students and parents declined. According to Burke, the Plaintiff also developed a pattern of sending students to the office instead of handling discipline herself. The Plaintiff disputes these allegations and further claims that these were not issues that were ever addressed to her by Ms. Burke. The School further alleges that eighth grade students also complained about the Plaintiff to school counselor Hansen. The Plaintiff disputes this assertion, contending that the statement is impossible for her to answer because it does not identify who complained or what they complained about.

5

The Defendant next asserts that Ms. Burke and other employees smelled a strong odor of alcohol on the Plaintiff during the 1999-2000 school year. The Plaintiff denies ever being under the influence of alcohol when she was teaching. Moreover, she notes that the School has not identified the other employees.

On May 3, 2000, Ms. Burke and Parish Pastor Father Patrick Render met with the Plaintiff to discuss the performance issues, noticeable odor of alcohol and to place her on a remediation plan for the following school year. The remediation plan provided for additional expectations for the Plaintiff throughout the next school year. This was the first time the School had to place a teacher on a remediation plan and have an attachment to a teacher contract. The Plaintiff also received a performance evaluation for the 1999-2000 school year in which she was rated "needs improvement" on 20 out of 55 total items.

D. Plaintiff's performance during 2000-01

Throughout her employment, the Plaintiff was required to work cooperatively with other faculty members and school staff; counsel students;

and be "firm, kind and patient;" be "self-disciplined with a high standard of personal conduct" and "exhibit good judgment."  The Plaintiff was also required to maintain good control in the classroom, hallways and all other areas of the school/church grounds.  The job description further provided that Plaintiff should make "an effort to detect conditions that hinder the growth and development of the child;" work "cooperatively with other faculty members [and] school staff;" evaluate "the learning capabilities of the students in relation to the subject matter;" counsel students, discuss their academic and behavioral difficulties with parents, and suggest remedial action and special referrals as needed.

The Defendant next alleges that as part of the remediation plan attached to her 2000-01 teacher contract, the Plaintiff was required to consult with the school counselor, Ms. Hansen, on a monthly basis, but she did not do so.  Additionally, the Plaintiff was required to meet with Ms. Burke on a regular basis, but she did not do so.[2]  The Defendant claims that

---

[2]The Plaintiff acknowledges these statements but claims that she attempted to meet with Ms. Hansen and Ms. Burke, both of whom apparently indicated that there was no need to do so.

during the school year, multiple students complained to Hansen about the Plaintiff.  The Plaintiff notes that this statement is impossible to answer because the School does not identify who made the complaint or what they complained about.  The School states that Ms. Hansen found it difficult to resolve these issues because the Plaintiff was unwilling or reluctant to cooperate or participate in discussions.  The Plaintiff denies that she was unwilling or reluctant to meet with Ms. Hansen.  The School claims that in November 2000, Ms. Hansen tried to arrange a meeting with herself, Plaintiff and a student to discuss some of the student's concerns, but Plaintiff declined to meet.  The Plaintiff disputes this assertion.  She vaguely recalls the incident in November 2000 reflected in Ms. Hansen's contemporaneous handwritten notes, but does not recall specifically if the meeting ever took place.

The Defendant alleges that on January 18, 2001, students reported to Ms. Hansen that the Plaintiff accused them of cheating and screamed loudly at them in front of the class.[3]  The Plaintiff does not recall the January 18

---

[3]The Plaintiff states that this allegation is impossible for her to address because it does not identify which students made the allegations.  She acknowledges she

incident reflected in Hansen's contemporaneous handwritten notes, but states it was not unusual for students to cheat.

The School claims that during a discussion between Ms. Hansen, the Plaintiff and a student on February 19, 2001, Hansen noticed an odor of alcohol on Plaintiff, which she reported to Ms. Burke.  The Plaintiff denies ever being under the influence of alcohol while teaching.

The School alleges that on March 21, 2001, Ms. Hansen met with the Plaintiff and another teacher to discuss academic modifications for one of Plaintiff's students with auditory and cognitive processing difficulties.  She declined to follow the modifications that Hansen recommended and the child's difficulties persisted.[4]

At the end of the 2000-01 school year, the Plaintiff received a performance evaluation from Jennifer Burke, which Plaintiff signed.  In the areas of "Catholic Identity," the Plaintiff was evaluated as

occasionally raised her voice at students.  Moreover, the Plaintiff testified that she has accused students of cheating in the past.

[4]The Plaintiff disputes this allegation, claiming she "denies that she was ever willing to work with Ms. Hansen and follow her suggestions for improving the learning environment for any student."  Presumably, the Plaintiff means she denies that she was ever unwilling to work with Hansen.

"Unsatisfactory/Needs Improvement" for each of the following categories: participation in catechesis program; religion taught daily at a prime time; and reinforces religion lessons throughout the day.   In the area of "personal/professional characteristics," the Plaintiff was evaluated as "Unsatisfactory/Needs Improvement" for each of the following categories: interest and enthusiasm for teaching; fairness toward students; uses discretion and consideration when speaking of or with others; informs parents through a written newsletter.   In the area of "classroom management," the Plaintiff was evaluated as "Unsatisfactory/Needs Improvement" for each of the following categories: maintains discipline in accordance with school policies and procedures; ability to discipline children keeping their dignity intact; treats children the way she expects to be treated.  In the area of "instructional skills and practices," the Plaintiff was evaluated as "Unsatisfactory/Needs Improvement" for each of the following categories: effectively uses class time and provisions for individual differences among students.  In the area of "professional development," the Plaintiff was evaluated as "Unsatisfactory/Needs Improvement" for each of

the following categories: consistently expands professional knowledge.[5]

The School and the Plaintiff entered into a contract for the Plaintiff to teach the eighth grade in the 2001-02 academic year.

E. Plaintiff's performance during 2001-02

The Defendant alleges that Ms. Burke and other faculty/staff personnel observed an odor of alcohol on the Plaintiff during the 2001-02 academic year. Several times prior to February 2002, Ms. Burke personally observed a strong odor of alcohol, hand tremors, bloodshot eyes on the Plaintiff and that Plaintiff took frequent restroom breaks. Ms. Hansen also detected an odor of alcohol on the Plaintiff prior to February 2002. On February 14, 2002, Ms. Burke and Ms. Hansen smelled a strong odor of alcohol on the Plaintiff's breath and observed her hands shaking. Burke noticed the Plaintiff emitted a strong odor of alcohol; hand tremors; and very red, bloodshot and glazed looking eyes as late as 10:45 a.m. on February 14. Hansen first smelled the odor of alcohol when she spoke with the Plaintiff at approximately 11:00 a.m. that day. School secretary Pat

---

[5]In response to these allegations, the Plaintiff acknowledges that she received this evaluation. However, it in no way reflects that she agreed with the assessment.

Florent also reported smelling a very strong odor of alcohol and observing the Plaintiff's hand tremors on February 14.  Ms. Hansen reported the odor to Ms. Burke, and both Hansen and Burke then spoke with Plaintiff.  Ms. Burke immediately notified the Parish Pastor, Father Dan Nolan, of the Plaintiff's condition on that morning.[6]   In Ms. Hansen's presence, Ms. Burke informed the Plaintiff that she would have to leave school for the day, and Plaintiff agreed.[7]  Another faculty member had to step in and take the Plaintiff's class on a scheduled field trip to the Lincoln Library.

Following the February 14, 2002 incident, Father Nolan instructed Ms. Burke to document what happened on that date, and told her that the Plaintiff must get an alcohol assessment.  The School alleges that Ms. Burke and Father Nolan met with the Plaintiff regarding the incident, and the Plaintiff apologized and said that she understood why she was sent home and that she had too much to drink.  In disputing this allegation, the Plaintiff again denies that she was ever under the influence of alcohol while

---

[6]The Plaintiff disputes each of these allegations and denies that she was ever under the influence of alcohol while teaching.

[7]The Plaintiff acknowledges that she was asked to leave but denies that she was under the influence of alcohol at the time.

teaching.  Father Nolan instructed the Plaintiff to get an alcohol evaluation and provided her with a choice of specific programs.  He told her that the parish would pay for the alcohol assessment; she could take time off for the assessment if necessary; and the school would make a decision regarding further action following the assessment.  Ms. Burke and Father Nolan also informed the Plaintiff that she must follow any recommendations for treatment stated in the evaluation.  The Plaintiff did not get the evaluation in February or the first half of March 2002.  Ms. Burke and Father Nolan met with the Plaintiff twice between February 14 and the end of March 2002 regarding the assessment, and eventually told Plaintiff she would be suspended if she did not get the evaluation by March 22, 2002.

The Plaintiff received the alcohol evaluation on March 20, 2002.  The evaluation recommended that she attend individual treatment sessions from April to November 2002.  The Plaintiff attended sessions from May to November 2002.  She did not stop drinking alcohol after attending the sessions.

(1) Contract and attachment for 2002-03 academic year

13

On May 30, 2002, Father Nolan and Ms. Burke met with the Plaintiff to discuss her performance review and contract for the following year. Prior to that meeting, they had decided to offer the Plaintiff a contract for another year, but again with a remediation plan attached to the contract. Ms. Burke did not consider the possibility of not offering the Plaintiff a contract for the 2002-03 academic year, because the school was still working with the Plaintiff and was very much invested in her as a teacher, and because Plaintiff was attending treatment sessions. However, in deciding to offer her a new contract, Ms. Burke felt they were giving the Plaintiff one more chance to turn things around. At the May 30, 2002 meeting, Ms. Burke and Father Nolan presented the Plaintiff with the contract and attachment for the 2002-03 academic year, and they explained the remediation plan to her. In addition to the regular contract requirements and those stated in the faculty handbook and Diocesan policies, the contract attachment required that the Plaintiff not come to school under the influence of alcohol or with any type of residual odor of alcohol.

The contract attachment also required the Plaintiff to exercise great

14

discretion when speaking to or about students; closely follow and enforce the school's disciplinary, dress code, and academic policies; and satisfactorily perform all of the duties and responsibilities of the position.  It provided that if the Plaintiff failed to meet the terms of the contract and its attachment, she could be terminated immediately.  Throughout the May 30, 2002 meeting, the Plaintiff expressed no concerns or questions about the contract or its attachment.  She signed the contract and attachment.

<u>(2) 2001-02 Performance evaluation</u>

During the May 30, 2002 meeting, Ms. Burke also discussed her evaluation of the Plaintiff's performance for the 2001-02 school year.  In that performance evaluation, Burke identified concerns with the Plaintiff's performance other than alcohol abuse.  Ms. Burke and Father Nolan explained they did not believe the Plaintiff followed the Catechesis program (daily religion classes) or properly prepared her students to receive the Sacrament of Confirmation, which is a very important component of the Catholic Church and faith.  The Plaintiff disputes this allegation by stating that she denies she was not following the Catechesis program.  Failure to

15

cooperate with the Director of Religious Education or prepare eighth grade students for Confirmation is contrary to the duties and responsibilities of the eighth grade teacher at St. Joseph School--as stated in the job description, the faculty handbook, the Diocesan policies and the contract. The Plaintiff denies failing to cooperate with the Director of Religious Education.  The Defendant alleges that Plaintiff disagreed with how the Director of Religious Education, Sister Mary Ellen, prepared and implemented the confirmation materials and program.  The Plaintiff responds by stating that there were certain portions of the program with which she disagreed.

The Plaintiff did not send newsletters to parents on a regular bi-monthly basis during the 2001-02 school year.  During the performance review, Ms. Burke discussed this with the Plaintiff and informed her that she must do so in the 2002-03 academic year.  The failure to send newsletters is contrary to school policy and the duties and responsibilities of an eighth grade teacher.

According to the job description for a junior high teacher at the

16

School, Plaintiff was required to respect the "confidentiality of personal and restricted information regarding students, faculty and school;" and exhibit a "high standard of personal conduct" and "good judgment." The School alleges that during the performance review, Ms. Burke also discussed the Plaintiff's lack of discretion when speaking to or about students. The Plaintiff did not deny making the statements identified in the evaluation; instead, she said she could not remember and asked who told Ms. Burke about them. Additionally in March 2002, a parent and student complained to school counselor Hansen that Plaintiff made inappropriate comments about the student to the class by disclosing the student's private health condition and accusing the child of lying. Ms. Hansen spoke with the Plaintiff who admitted she should have discussed the matter with the student privately, but felt the student should have been more responsible. The School claims that Plaintiff does not remember the incident of March 2002. The Plaintiff denies these allegations that she inappropriately spoke about students.

The Defendant alleges that the 2002-03 performance review also

17

encouraged the Plaintiff to maintain a neat and orderly classroom. During the review, Ms. Burke discussed with the Plaintiff the fact that she did not consistently enforce school discipline and behavior policies. The Plaintiff denies that Burke expressed these concerns to her.

The School claims that during the review, Ms. Burke encouraged the Plaintiff to spread her field trips out throughout the year and to tie them in better with the curriculum. The Plaintiff disputes this allegation. The junior high teachers were required to make an effort to detect conditions that hinder the growth and development of their students; to be sensitive to the needs of the age group; demonstrate and use available teaching aids in presenting subject matter; and determine the "method, amount, complexity and kind of instruction which will achieve maximum progress." The School alleges that during the May 30, 2002 meeting, Ms. Burke and Father Nolan also said that the Plaintiff should be more accommodating of special students with special learning needs in her classroom, and that excessive use of worksheets was not acceptable. The Plaintiff denies this allegation.

18

The Plaintiff was encouraged by Ms. Burke to attend and participate in more school related activities.  In order to teach at St. Joseph School, the Plaintiff was required to maintain her State Certification.  According to her job description, the Plaintiff was required to possess "competence in . . . her field" through "further education and in-service training."  The Plaintiff had to obtain 120 Continuing Professional Development Units ("CPDU") over a five-year period in order to renew her teaching certificate and keep it valid and active.  In order for teachers to earn the necessary number of units, the school pays for the cost of seminars, and will obtain a substitute to allow teachers to miss school if the seminar is held during school hours.  During the May 30, 2002 performance review, Ms. Burke encouraged the Plaintiff to attend classes and seminars for CPD credit, and to expand her knowledge base.

F. Plaintiff's performance during 2002-03

Father Tom Holinga replaced Father Nolan as Pastor of St. Joseph's during the summer of 2002.  The Defendant alleges that almost immediately upon taking over as Pastor, Father Holinga noticed that the

19

Plaintiff consistently sent students out of her classroom.  The Plaintiff denies "consistently" doing this.  She claims that while she sent students into the hall from time to time, there were other teachers who did the same thing.  The School contends that Jennifer Burke also noticed issues with the Plaintiff's performance almost immediately after school began in August 2002.  The Plaintiff disputes there were issues relating to her performance.

(1) Classroom management & safety concerns

The Plaintiff was required and expected to manage her classroom on a day-to-day basis.  According to the Faculty/Staff Handbook, the "administrator is responsible for insuring adequate supervision of students during the entire time they are on the parish and school premises . . . all teachers share this responsibility with the administrator; and each teacher is legally responsible for the supervision of his/her students."  The handbook expressly states that "students must never be left unattended;" "teachers are not to leave their class to make copies, use the restroom, etc." and "no child is permitted to be in any classroom without the supervision of a teacher."

The Defendant alleges that Ms. Burke observed that the Plaintiff left

her classroom unattended on an almost daily basis throughout the 2002-03 school year, in violation of school policy.  Burke discussed this issue with the Plaintiff during the 2002-03 school year and in prior years.  During the 2002-03 school year, Ms. Burke observed that Plaintiff did not keep a neat and orderly classroom, contrary to her job description and requirements.  Specifically, Burke observed that Plaintiff did not implement effective procedures for lining up, traveling quietly in the hallways, retrieving student belongings, or gathering and recording daily assignments.  The Plaintiff attributes her inability to manage the classroom to two students.  The Plaintiff denies these allegations.

The eighth grade teacher was required to supervise her students at all times and maintain orderly conduct and promote self-discipline among her students.  The School alleges that throughout the course of the 2002-03 school year, Ms. Burke and Father Holinga both developed concerns for the students' safety.  The Plaintiff disputes this allegation and denies that she did anything that would jeopardize the safety of the students in her care.  Moreover, neither Father Holinga nor Burke ever suggested to the Plaintiff

21

that the students in her care were not safe.  The Faculty/Staff Handbook provides: "no student is allowed to be isolated from the class in any place where s/he cannot be directly supervised by the teacher.  No students should be placed in the hallway."  The School claims that Ms. Burke observed the Plaintiff frequently yelling and sending students out of the classroom.  The Plaintiff denies that she frequently yelled at her students and further states that Burke was rarely in her classroom and would therefore not have had an opportunity to witness these incidents.  The Plaintiff admits that she was sometimes "short" with her class.  She claims that other teachers were as well.  The School asserts that Father Holinga observed the Plaintiff's students unattended in the hallway every day after a period of time.  The Plaintiff disputes that she frequently left students alone in the hall.

The Defendant further claims that Ms. Burke also witnessed eighth grade students being loud and disruptive, but the Plaintiff would not take control of the situation.  The Plaintiff denies that she did not discipline her students.  According to Ms. Burke, the Plaintiff's students used foul language in the classroom without the appropriate correction or discipline

by the teacher.  The Plaintiff denies failing to discipline her students for foul language.  The School claims that parents of some students also reported to Burke that students were allowed to use foul language without being disciplined by the Plaintiff.  The Plaintiff states that no such incidents were reported to her; moreover, Ms. Burke has provided no factual background for these allegations.  The seventh grade teacher who had the same students the previous year did not have similar problems or experiences with the class.  The School further contends that the Plaintiff also made physical movements toward and/or contact with a student when she was angry at him, an allegation which Plaintiff denies.

### (2) Instructional and teaching techniques

As an eighth grade teacher, the Plaintiff was expected to prepare her students for high school.  Her job description provided that she was required to "instruct, guide and motivate" her students; demonstrate and use available teaching aids in presenting subject matter; and explain the subject matter. As a policy, Ms. Burke reviews report cards and mid-quarter reports for all students.  Ms. Burke also reviews lesson plans and grade books for all

teachers on a monthly basis, makes notes on them if appropriate and returns the plans to the teachers.

The Defendant alleges that during the 2002-03 school year, Ms. Burke observed the eighth grade class was not spending enough time on academics. Ms. Burke says she was concerned about the quality of the students' instruction time.   The Plaintiff claims that Ms. Burke never made statements like this to her.  Moreover, Burke was not in the classroom and would not have had the opportunity to witness these incidents.  Ms. Burke observed that the Plaintiff continued to rely heavily on worksheets as a method of instruction.  She also noticed the Plaintiff's students sharing answers with each other, an issue which was addressed with Plaintiff.  Ms. Burke also recalled that the Plaintiff assigned worksheets and gave credit to the student for completing the assignment, but did not grade the answers.

The School alleges that as the 2002-03 academic year progressed, Ms. Burke heard many students say that they did not understand several math topics.  The Plaintiff disputes this allegation on the basis that Burke has not identified who these students were, what specifically she heard or where she

heard it.  The School contends that during the school year, other teachers commented to Ms. Burke that the Plaintiff was not providing adequate supervision or instruction, especially in math, and that Plaintiff allowed the students to work together on worksheets which were graded individually. The Plaintiff asserts that allegation is impossible to respond to because the School does not identify which teachers made the comments.  Moreover, the School does not say how other teachers would have such knowledge.

The Defendant alleges that after the Plaintiff stopped working on May 1, 2003, a year-end math test was administered to all of the seventh and eighth graders.  All of her students failed the test.  The School further claims that after the Plaintiff stopped working, Ms. Burke observed that the eighth grade class did not complete the necessary curriculum for history and had not progressed through the material on the second half of the twentieth century.[8]

### (3) Catholic identity/failure to teach religion

As the eighth grade teacher, the Plaintiff was required to conduct a

---

[8]The Plaintiff contends that these allegations are immaterial, in that what occurred after her termination is not relevant.

program of education in accordance with the stated philosophy and objectives of the Diocese and St. Joseph School and to teach religion to her class every day. The School contends that by reviewing the Plaintiff's lesson plans, Ms. Burke believed Plaintiff was not teaching religion five days a week. It further claims that Ms. Burke noticed the Plaintiff was not teaching the two religion text books, even though this was a requirement. The Plaintiff disputes these allegations and denies that she was not teaching religion. The School asserts that by May 2003, the Plaintiff's class had not completed either of the two religion text books.[9] The School further alleges that parents of students also complained to Ms. Burke that the Plaintiff was not teaching their children religious education to the degree expected or required. The Plaintiff denies that she was not teaching religion and states that no such complaints were made to her by parents or Ms. Burke.

St. Joseph's expects teachers to lead their class in prayer in the morning, at lunch and at the end of the day. The School alleges that Ms. Burke observed that the Plaintiff did not lead her class in daily prayer at

---

[9]The Plaintiff claims that this allegation is immaterial, on the basis that what occurred after her termination is not relevant.

lunch or the end of the day. It further claims Ms. Burke observed that while the Plaintiff led morning prayer, several students did not participate and Plaintiff did nothing to correct the situation or have them participate. The School contends that Burke addressed this issue with Plaintiff, who responded either "okay" or "I don't know what to do." The Plaintiff disputes these allegations and claims that Ms. Burke did not address this issue with her.

<u>(4) Complaints from parents and students</u>

As a requirement of the job, a teacher must maintain contact and communication with parents, work cooperatively with parents, and counsel and discuss students' needs with parents. The School contends that starting early and continuing throughout the 2002-03 school year, several parents and students complained to Ms. Burke about the quality of education and instruction, use of foul language in class, and the lack of supervision and safety concerns. According to the School, several parents expressed concern in the first quarter of the academic year that their children were not being adequately prepared for high school. Moreover, the School claims that in

September 2002, Ms. Burke received a report from another parent that according to her son, the Plaintiff told one of her students that her husband has cancer and the student had no heart.  The Plaintiff disputes these allegations and notes that the School did not identify the facts surrounding the alleged complaints.  She further claims that Ms. Burke never addressed a parent's complaint with her.

The Defendant alleges that Ms. Burke felt with respect to many of the parents' academic concerns, the root of the problem was poor communication from the Plaintiff.  In October 2002, Ms. Hansen met with a parent who complained that Plaintiff screamed for no reason and was not preparing the class for high school.  The parent told Hansen that other parents were similarly concerned that Plaintiff was not meeting their children's needs.  Ms. Hansen reported this conversation to Ms. Burke.  The School claims the Plaintiff does not recall this incident or meeting at all.  The Plaintiff disputes these allegations and notes that the School did not identify the facts surrounding the alleged complaints.  She further states that Ms. Burke never addressed a parent's complaint with her.

28

The School alleges that parents also complained to Ms. Burke that their children were subject to harassment by other students and that the Plaintiff did nothing to stop it. Moreover, other parents complained to Ms. Burke that Plaintiff either ignored or refused to believe their children and was non-responsive to certain students. Parents also complained that Plaintiff lacked empathy and was making the situation worse for children. According to Ms. Burke, the fact that a parent comes to her at all signifies that there is a problem. The parents made no complaints to Ms. Burke the year before when their children were in seventh grade. The Defendant claims that Ms. Burke addressed or reported each parental complaint to the Plaintiff. The Plaintiff disputes each of these allegations and notes that the School did not identify the facts surrounding the alleged complaints. She further states that Ms. Burke never addressed a parent's complaint with her.

### (5) Failure to communicate with parents and students

According to school policy, teachers are required to maintain communication with parents and respond to notes and phone calls from parents/guardians. The Plaintiff was also required to maintain contact and

communication with parents, work cooperatively with parents, and counsel and discuss students' needs with parents.  Ms. Burke observed that the Plaintiff did not initiate contact with parents unless directed to do so by the principal.  The School alleges that the Plaintiff relied on another teacher to contact parents on her behalf rather than doing it herself.  It further claims that the Plaintiff did not respond to notes or telephone calls from parents in a timely manner.  Moreover, she also failed to respond to letters from students.  The Plaintiff denies these statements and notes that it is impossible for her to respond because no specific incidents are cited.  The School states that teachers are also expected to attend extracurricular activities and parent club meetings.  The Plaintiff did not attend any parent club meetings or extracurricular activities such as sporting events or Fall Festival during the 2002-03 school year.

At the time Plaintiff worked for St. Joseph's, teachers were required to send bi-monthly newsletters home to the parents.  The purpose of the newsletter was to communicate with parents so they could be involved in their children's education.  Teachers were also required to provide Ms.

Burke with a copy of the newsletters so that she knew what was going on and was aware of the parent-teacher communications.  The Plaintiff did not send bi-monthly newsletters home to parents during the 2002-03 school year.  The Defendant alleges parents informed Ms. Burke that the Plaintiff did not send newsletters home; moreover, Burke did not receive copies of any newsletters from Plaintiff.  The Plaintiff disputes these allegations on the basis that Ms. Burke said she forwarded all parent complaints to the Plaintiff, but did not address this issue with Plaintiff.  According to the School, Ms. Burke spoke to the Plaintiff about her failure to send the newsletters during the course of the 2002-03 school year.  The Plaintiff denies this statement.

The Plaintiff explains that she did not send regular newsletters home because other teachers and the principal already sent letters with the same information she would have written.  But for a letter home at the beginning of the school year in August 2002, and a note asking parents to send money for graduation photographs, Ms. Burke was not aware of any other written communication initiated by the Plaintiff to parents during the school year.

<u>(6) Failure to enforce school policy and inappropriate comments</u>

The Defendant alleges that Ms. Burke observed that the Plaintiff failed to consistently enforce the dress code, an allegation which Plaintiff denies.  Ms. Burke discussed the dress code issue with the Plaintiff and all faculty members.  The Plaintiff was required to maintain orderly conduct and supervise her students at all times.  The School asserts the Plaintiff sent her students to the school office with no instruction or follow up on her part.  Moreover, Ms. Burke observed that Plaintiff did not consistently enforce rules or implement discipline in her classroom.  The Plaintiff disputes these allegations and denies that she frequently sent students into the hallway as a means of discipline.

Ms. Burke prepared contemporaneous notes regarding incidents or observations of the Plaintiff.  Her notes reflect that students also complained that Plaintiff did not consistently enforce rules in the classroom. The Plaintiff singled out one or two students in her class as causing the problems she had with the class.

In March 2003, the Plaintiff did not contact a parent after one of her

32

students received seven discipline tickets.  The parent sent a note to the Plaintiff asking to discuss the matter, but Plaintiff did not respond to the parent.  When asked by Ms. Burke why she did not respond to the parent, the Plaintiff responded that she did not feel a need to respond.  When Ms. Burke spoke with the Plaintiff about the tickets, Plaintiff said the tickets got away from her and she had just not gotten to them.  It is the teacher's responsibility to keep track of behavior warnings or steps for each student. It is the individual teacher's responsibility to contact the parent when the teacher is having a problem with that parent's child.  The Plaintiff relied on another teacher to discuss the problem with the parent.

As a teacher at St Joseph's, the Plaintiff was required to respect the confidentiality of personal and restricted information regarding students, be sensitive to the needs of her students, and maintain a high standard of personal conduct and good judgment.  Ms. Burke heard the Plaintiff say that certain students were "lazy" or "beyond help," both academically and behaviorally.  Other faculty or staff also reported they heard the Plaintiff comment that her students were "lazy," "beyond help,"

and "beyond reaching them."

An incident occurred between some of the Plaintiff's students in the computer lab while under her supervision, after which Plaintiff commented about one student in the presence of Ms. Burke, another student, and her parent. Ms. Burke felt that the comment and the manner in which the Plaintiff said it were inappropriate. She told the Plaintiff it was inappropriate for her to discuss one student in front of another student and her parents. In response, the Plaintiff told Ms. Burke, "I didn't really say anything." The Plaintiff also commented on her personal situation at home to her students.

<u>(7) Failure to plan field trips or class picnic</u>

During the 2002-03 school year, the Plaintiff took her students on school-sponsored field trips only. Prior to her leaving school in May 2003, the Plaintiff told Ms. Burke that she would not take her students on a field trip to the Cahokia Mounds. When Burke asked the Plaintiff why she would not take her class on this field trip, Plaintiff responded that she could not control them. The eighth grade class did not take a field trip to the

34

Cahokia Mounds, as did eighth grade classes in previous years. When the Plaintiff stopped working on May 1, 2003, she had not planned the year-end picnic for her class.

(8) Modifications for special needs and professional development

As a junior high teacher at St. Joseph's , the Plaintiff was required to be sensitive to the needs of her students; work cooperatively with faculty, staff and parents; evaluate each student's learning capabilities and determine the method, amount, complexity and kind of instruction necessary to achieve maximum progress. The School expected the Plaintiff to make and/or follow modifications for students with those needs. The School claims Ms. Burke observed the Plaintiff did not initiate or use modifications for students with special needs such as learning styles, preferential seating, health needs, and behavioral or emotional needs. Moreover, when other professionals put modifications into place for one of the Plaintiff's students, Ms. Burke observed that Plaintiff would follow it begrudgingly, minimally or not at all. The Defendant further alleges that Ms. Hansen also met with resistance from the Plaintiff when she

35

recommended modifications for students.  The School contends that a student in the Plaintiff's 2002-03 class had learning disabilities, but Plaintiff believed the student simply did not want to work, although she agreed that his behavior may have been related to a learning disability.  The Plaintiff disputes these allegations and denies that she did not comply with modifications that had been requested for her students.

The Catholic Diocese of Springfield and St. Joseph School require all teachers to maintain the proper State teaching certification.  At the time of her termination, the Plaintiff was not even close to half way to obtaining the 120 units necessary to renewing her certificate.  The Plaintiff did not attend any training, in-services, continuing education or other types activities to earn CPD units during the 2002-03 school year.

(9) Issues related to alcohol during the 2002-03 school year[10]

The School alleges that periodically throughout the year, faculty and staff reported to Ms. Burke that they observed a strong odor of alcohol on

---

[10]The Plaintiff disputes almost all of the Defendant's allegations pertaining to issues related to alcohol.  In disputing these allegations, the Plaintiff states simply that she denies she was ever under the influence of alcohol while at school.

the Plaintiff.  On December 17, 2002, Ms. Hansen came to the Plaintiff's class to discuss a parent's phone call and noticed a strong odor of alcohol on Plaintiff, which she reported to Ms. Burke and school secretary Pat Florent. The Plaintiff does not recall this incident.

The Plaintiff continued to drink alcohol in February 2003.   On February 20, Ms. Hansen reported an incident to Ms. Burke that took place when Burke was at a conference.  Specifically, Hansen reported that a fight took place on the playground and the Plaintiff brought the students involved to the school office.  Ms. Hansen heard the Plaintiff in the hallway yelling loudly at the students to "sit down;" "I'm sick of this;" "get out of here;" and "shut up."  The Plaintiff does not remember the February 20, 2003 incident on the playground or outside the school office.  Ms. Hansen went to the hallway to assist and immediately noticed a strong smell of alcohol on the Plaintiff's breath.  She also observed that her hands were shaking, her voice was very loud, and she appeared out of control.  Ms. Florent also reported to Ms. Burke that she noticed a strong odor of alcohol on the Plaintiff and that Plaintiff appeared out of control.

According to the Defendant, Ms. Hansen took control of the Plaintiff's classroom at Plaintiff's request. She sat in with the Plaintiff and her class for the rest of the day. The Plaintiff recalls only that she asked Ms. Hansen to speak to her class once to give input regarding a problem where some students were picking on others. Ms. Burke met with the Plaintiff to discuss this incident the next day after it occurred. She told the Plaintiff that Ms. Hansen and Ms. Florent reported noticing a strong odor of alcohol on Plaintiff. The Plaintiff neither denied the allegation nor offered any explanation. After the February 20, 2003 incident, Ms. Burke spoke with Father Holinga and told him about the Plaintiff's conduct and odor of alcohol. According to the St. Joseph School Faculty/Staff Handbook, a teacher may be discharged for alcohol impairment or evidence of such impairment which may affect job performance.[11]

### (G) Decision not to offer Plaintiff a contract for 2003-04

Father Holinga made the final decision not to offer the Plaintiff another contract. Ms. Burke recommended and concurred with the

---

[11]This statement pertaining to the faculty/staff handbook is the only allegation related to "alcohol issues" which is not disputed by the Plaintiff.

decision.   They had first discussed the Plaintiff's past performance in February 2003 when they met to discuss the following school year.  It was during or after the February 2003 meeting that Father Holinga and Ms. Burke first discussed not renewing the Plaintiff's contract for the 2003-04 school year.  They discussed this issue several times between February and early April 2003.  Prior to making the decision, Father Holinga reviewed the Plaintiff's personnel file, including the remediation plans attached to prior contracts and the notes in her file.  Ms. Burke and Father Holinga also consulted Theresa Hansen and the Diocesan Office of Catholic Education.

The School alleges that the final decision not to offer the Plaintiff another contract was based on the Plaintiff's failure to fulfill the contract remediation plans and Father Holinga's concern for the safety of the children.  The Plaintiff's alcohol use was also a factor in the decision not to offer her a contract.  Father Holinga also based the decision on the fact that the parents of 12 out of 23 students complained, and some complained about the safety of their children.  Another factor in the decision was that the following year's eighth grade class was significantly larger than the 2002-

03 class.  The Plaintiff disputes each of these allegations and notes that the reasons for her discharge are the ultimate issue in this case.

The Plaintiff met with Father Holinga and Ms. Burke on April 7, 2003, at which time they informed her that she would not be offered a contract for the following school year.  Father Holinga and Ms. Burke explained their decision not to offer the Plaintiff a contract, as outlined in the April 7 memo prepared by Ms. Burke.  In response, the Plaintiff asked for another chance.  The Plaintiff did not offer any explanations or dispute any of the concerns stated in the memo and April 7, 2003 meeting.

The Plaintiff chose not to finish teaching the 2002-03 academic year, and took a leave commencing May 1, 2003.  Substitute teachers were used to teach the eighth grade class for the rest of the year.  The Plaintiff claims these allegations are immaterial.

H. Treatment of other teachers in protected class

The Plaintiff claims that Ms. Burke engaged in a pattern of treating herself and other teachers differently than younger workers.  The School notes that one such teacher, Kathy Burshears, received a performance review

rating her "satisfactory" and "area of strength" on all but four items for the 2001-02 school year.  Ms. Burshears received the same scores on all items for the 2002-03 school year and was offered a teaching contract for the 2003-04 year.  She is currently employed as a third grade teacher at the school.

Another teacher in the protected class was Margaret LaFata.  For the 2001-02 school year, Ms. LaFata received a performance review rating her "satisfactory" or "area of strength" on all items.  The following year, she received positive scores in all but three areas.  Ms. LaFata received an offer for the 2003-04 academic year and is currently employed by the school as a kindergarten teacher.

Janet Roglis was another teacher in the protected class.  Ms. Roglis received an offer for a teaching contract for the 2003-04 academic year on a part-time basis.  She was certified in and taught physical education at the school.  Ms. Roglis left the school for another job in July 2004.  Kathy Burshears, Margaret LaFata and Janet Roglis did not have remediation plans attached to their contracts for the 2002-03 school year.

41

The School also employs Sister Ann Smith as the learning resource teacher.  Sister Ann was born on October 5, 1927, and was 75 years old when the Plaintiff's employment was terminated.  For the 2002-03 school year, Sister Ann received positive performance review ratings in all categories.  For the 2003-04 school year, Sister Ann received a performance review rating her a "4" or "5" on all items, on a scale of 1 to 5 (with 5 being the highest).

## I. Treatment of younger teachers outside protected class

The Plaintiff believes that younger teachers such as Rachel Cunningham, Christine Owens, Heather Teater and Carol Squires were treated more favorably than herself.  The School alleges that since she started working at the school, Ms. Burke has not faced issues with any other teachers similar to those which she faced with the Plaintiff.  The Plaintiff claims that this allegation is immaterial and disputes that there were any "issues" that Ms. Burke faced.  The School contends that other teachers did not have similar problems with the Class of 2003 that the Plaintiff had.

The Plaintiff makes the same objection to this allegation.[12]

Ms. Cunningham, who was born in 1967, taught the fourth grade in the 2002-03 academic year.  Fourth grade is a "primary grade," as opposed to "junior high school," and a fourth grade teacher has a different job description than did the Plaintiff.  Ms. Cunningham did not have a remediation plan attached to her contract for the 2002-03 academic year. For the 2001-02 and 2002-03 school years, Ms. Cunningham received performance reviews rating her "satisfactory" and "area of strength" on all items.

Christine Owens, who was born in 1973, taught seventh grade in the 2002-03 school year.  Seventh grade is considered an upper grade (junior high), so Ms. Owens would have the same job description as the Plaintiff had.  Ms. Owens was not put on a remediation plan or had one attached to her contracts.   For the 2001-02 school year, Ms. Owens received a

---

[12]In her response to the Defendant's motion for summary judgment, the Plaintiff's response to these allegedly undisputed material facts are listed in the category of statements of fact which she claims to be immaterial.  It appears, however, that these statements might be more accurately described as statements of fact which the Plaintiff disputes.

performance review rating her "satisfactory" or "area of strength" on all but two of the 57 total items. The following year, Ms. Owens received the same positive ratings on all but three of the 57 items. For the 2003-04 school year, Ms. Owens received a performance review rating her "4" and "5" on all items.

Heather Teater, who was born in 1975, taught fifth grade at St. Joseph's. Fifth grade is a "primary grade," as opposed to "junior high school," and the fifth grade teacher has a different job description than did the Plaintiff. For the 2001-02 school year, Ms. Teater received a performance review rating her as "satisfactory" or "area of strength" on all but two items. The following year, she received either of those ratings on all items. For the 2003-04 school year, Ms. Teater received a performance review rating her a "4" or "5" on all but one item.

Carol Squires, who was born in 1961 and was 42 years old when the Plaintiff was not offered a contract, taught sixth grade at St. Joseph's. Sixth grade is considered an upper grade, so Ms. Squires would have the same or a similar job description as the Plaintiff. Ms. Squires was not on a

44

remediation plan or had one attached to any of her contracts.  In the two school years between 2000 and 2002, Ms. Squires received a performance review rating her "satisfactory" or "area of strength" on all but two items. The following year, she received either of those ratings on all items.  For the 2003-04 school year, Ms. Squires received a performance review rating her a "4" or "5" on all but one item.

### J. Plaintiff's replacement

After the Plaintiff left St. Joseph School at the end of April 2003, Ms. Burke and substitute teachers taught the eighth grade for the remainder of the year.  The School offered a contract to Judy Fignolio for the eighth grade teacher position in the 2003-04 school year.  Ms. Fignolio was born in 1955, making her 48 years of age when she was hired.  Ms. Fignolio is certified by the State of Illinois to teach kindergarten through ninth grade. According to her resume, Ms. Fignolio holds a Type 03 Elementary K-9 Teaching Certificate.  She has a bachelor's degree in elementary education and first received her state certification in 1976.  She was employed as a classroom and substitute teacher for ten years prior to coming to the school.

For the 2003-04 school year, Ms. Fignolio received a favorable performance evaluation.

The School employed 22 individuals during the 2003-04 school year, fourteen of whom were over 40 years of age, including Sister Ann (10/5/1927); Patricia Florent (DOB 1/29/1937); Christine Herndon (DOB 10/3/1942); Eileen Kuchar (DOB 10/7/1947); Donna Scott (DOB 4/19/1958); and Mary Story (DOB 12/13/1950).

### K. Plaintiff's additional statement of undisputed facts[13]

The Plaintiff alleges that she always had a very good relationship with the school's principals prior to Ms. Burke.  The School contends this allegation is immaterial, in that the Plaintiff's relationship with former employees who played no role in the decision not to renew her teaching contract for the 2003-04 academic year is irrelevant.  The Plaintiff further claims that prior to the 1999-2000 school year, she had no difficulties with Ms. Burke.  The School asserts this allegation is also immaterial, in that the

---

[13]In her response to the Defendant's motion for summary judgment, the Plaintiff has submitted some additional facts which she deems undisputed and material to the motion.  Some of these facts have already been alleged in support of the Defendant's motion.  The Court will note only those which are not repetitive.

46

Plaintiff's alleged "difficulties" (or lack thereof) with Ms. Burke prior to the time period stated are irrelevant to the decision not to renew Plaintiff's contract for the 2003-04 academic year.

The principal is responsible for the day to day activities of the school. The Plaintiff alleges that at no point in time did she ever refuse to meet with Theresa Hansen regarding any students. Moreover, the Plaintiff always followed through on the suggestions made by Ms. Hansen. The School disputes that Plaintiff never refused to meet Ms. Hansen. The School states, "According to Ms. Hansen (whom plaintiff expressly declined to depose), plaintiff declined to meet with her and a student on at least one occasion in November 2000." The School further asserts that Ms. Hansen recalls that she was met with resistance from the Plaintiff when she recommended modifications. Moreover, it claims that during a meeting in March 2001, Ms. Hansen recalled that Plaintiff refused to follow recommendations for modifying a student's curriculum and grading scale.

The Plaintiff alleges it was very rare that Ms. Burke was in her classroom and did not observe Plaintiff teaching to perform an evaluation

47

after 1997.  The School disputes this allegation and says that it makes no sense.[14]  Nonetheless, the Defendant denies that Ms. Burke was rarely in the Plaintiff's classroom.  It further disputes that Ms. Burke did not evaluate the Plaintiff's performance after 1997.

The Plaintiff alleges that during the 2002-03 academic year, no parent ever complained to her about her teaching.  Moreover, Ms. Burke never brought any parent concerns to her attention.  The School claims this allegation is immaterial, in that whether or not a parent complained directly to the Plaintiff about her teaching is not relevant.  Similarly, the School asserts that whether Ms. Burke brought complaints to the Plaintiff's attention is also immaterial (though Burke stated that she did speak to the Plaintiff about some complaints).  The School contends that the salient point–and the one that the Plaintiff did not and is unable to dispute–is that parents complained about Plaintiff to Ms. Burke throughout the 2002-03 school year.  The School notes that in her "denial" of its alleged undisputed

---

[14]Presumably, the Plaintiff is saying that because it was a rare occurrence for Ms. Burke to visit her classroom, Ms. Burke did not observe Plaintiff teaching often enough after 1997 to adequately evaluate her teaching ability.

material facts, the Plaintiff says only that Ms. Burke did not report the complaints to her.  In other words, she does not dispute the School's assertion that Ms. Burke did receive complaints about the Plaintiff from parents.

## II. ANALYSIS

### A. Summary judgment standard

The entry of summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A "material fact" is a fact which may affect the outcome of the litigation, given the substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  There is a "genuine issue" of material fact when a reasonable juror could find that the evidence supports a verdict for the non-moving party.  Id.  "Rule 56(c) mandates the entry of judgment, after adequate time for discovery and upon motion, against a party who fails to make showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. If a defendant can show the absence of some fact that the plaintiff must prove at trial, then the plaintiff must produce evidence, and not merely restate his allegations, to show that a genuine issue exists. Sartor v. Spherion Corp., 388 F.3d 275, 278 (7th Cir. 2004).

B. Age Discrimination in Employment Act

Pursuant to the ADEA, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff may use the "direct method" or "indirect method" to prove an ADEA violation. See Cerutti v. BASF Corp., 349 F.3d 1055, 1060 (7th Cir. 2003). The Plaintiff in this case acknowledges she has no direct evidence, but claims that she has indirect evidence of age discrimination.

Because the Plaintiff is proceeding under the indirect method of proof, her claims under the ADEA are evaluated using the McDonnell Douglas v. Green, 411 U.S. 792 (1973) framework. See Koski v. Standex Intern.

50

Corp., 307 F.3d 672, 676 (7th Cir. 2002).  A plaintiff using this burden-shifting approach must first establish a *prima facie* case of discrimination.  Id. The Plaintiff must demonstrate the following: (1) she was a member of a protected class (at least 40 years of age); (2) she was meeting her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated younger employees were treated more favorably. Id. (citing McDonnell Douglas, 411 U.S. at 802.).  Because the Plaintiff was 56 years old when the School decided not to offer her another contract, there is no dispute that she was in the protected class and suffered an adverse employment action.  The School contends, however, that the Plaintiff is unable to show she was meeting her employer's legitimate expectations and that similarly situated younger employees were treated more favorably.

If the plaintiff is able to establish a *prima facie* case of discrimination, the burden then shifts to the employer who must offer a legitimate and nondiscriminatory reason for the challenged employment action.  See Koski, 307 F.3d at 676.  If the employer provides a legitimate, nondiscriminatory

reason, the burden shifts back to the plaintiff who must then show that the proffered reasons are a pretext for a discriminatory reason.  Id. at 677.

### C. Whether Plaintiff can demonstrate *prima facie* case

### (1) Plaintiff's performance

The Defendant School contends that the undisputed facts make it clear that the Plaintiff did not perform her job satisfactorily.  Beginning with the 1999-2000 school year, the Plaintiff received three consecutive unsatisfactory performance evaluations.[15]  The School asserts that many of the same problems were noted on the Plaintiff's evaluations each year.  Specifically, she did not communicate appropriately with parents and consistently failed to send the twice-monthly newsletters.  Moreover, the Plaintiff regularly relied on worksheets and had difficulties controlling and managing her classroom.  The School claims that for several years, students and parents complained about the Plaintiff's performance.

The School alleges the Plaintiff committed several policy violations in

---

[15]The School notes that because it had decided not to offer the Plaintiff another contract, it did not prepare a performance evaluation for the 2002-03 academic year.

her final contract year.  Specifically, the Plaintiff left her classroom on occasion and regularly sent students into the hallway as a form of discipline, both of which violated school policy.  Additionally, her class was not on pace to finish the necessary curriculum in multiple subjects.

The Defendant asserts that the most important problems with the Plaintiff's performance concerned the complaints that parents and students made to Ms. Burke and Ms. Hansen.  These complaints were of particular significance because they implicated the children's safety.

The School next alleges that since at least the spring of 2000, there were occasions that Ms. Burke and other school officials smelled an odor of alcohol on the Plaintiff and witnessed her with hand tremors and bloodshot eyes.  This occurred multiple times even though the Plaintiff was counseled not to appear at school in this condition.  The School notes that one occasion was so bad that she was actually sent home.  School policy provides that alcohol impairment is a basis for discharge.  Moreover, the Plaintiff's 2002-03 remediation plan provided that she was subject to discharge for coming to school with an odor of alcohol.

Based on the multiple policy violations, documented poor performance and noticeable odor of alcohol, the School contends that the Plaintiff plainly did not perform her job satisfactorily. This conclusion is bolstered by her failure to adhere to the terms and conditions of her probation.

The School alleges that the Plaintiff does not dispute that the various incidents resulted in its decision not to offer her another contract. Instead, she offers excuses and explanations for her behavior and blames the problems on two students. The School contends, however, that in order to withstand summary judgment, the Plaintiff must point to something other than her own perception of her performance.

In her memorandum in opposition to the School's summary judgment motion, the Plaintiff first notes that "rigid adherence" to the <u>McDonnell Douglas</u> test is not always appropriate. <u>See</u> <u>Olson v. Northern FS, Inc.</u>, 387 F.3d 632, 635 (7th Cir. 2004) (noting that the ultimate question is whether age was a motivating factor in the decision to fire the employee.). The Plaintiff alleges that she has established "a significant body of evidence" that, when collectively considered, forms "a convincing mosaic of

54

discrimination." Nonetheless, the Plaintiff maintains she is able to point to facts which establish each of the elements of her *prima facie* case.

The Plaintiff alleges that the facts underpinning the issue of whether she was performing according to the School's legitimate expectations greatly overlap with the issue of pretext in this case. She notes that other courts have cautioned that courts "must be careful not to conflate the distinct stages of the <u>McDonnell Douglas</u> test." <u>See</u> <u>Cicero v. Borg-Warner Automotive, Inc.</u>, 280 F.3d 579, 585 (6th Cir. 2002); <u>see</u> <u>also</u> <u>Aragon v. Republican Silver State Disposal, Inc.</u>, 292 F.3d 654, 659 (9th Cir. 2002).

The Plaintiff contends that in suggesting she was not meeting its legitimate expectations, the School relies almost exclusively on the subjective evaluation of Ms. Burke. Citing an Eleventh Circuit case, the Plaintiff asserts that the School's reliance on the principal's subjective evaluation is a problem because the School does not provide any specific facts to support their subjective conclusions. <u>See</u> <u>Bass v. Board of County Commissioners</u>, 256 F.3d 1095, 1105-06 (11th Cir. 2001) (noting that in order for an employer's subjective reason to constitute a legitimate,

nondiscriminatory reason, the employer must articulate "a clear and reasonably specific factual basis upon which it based its subjective opinion.").

The Plaintiff contends that the rationale in <u>Bass</u> is well founded because it "becomes impossible for an employee to refute the generalized claim that they were not meeting performance expectations." She asserts that there must be a factual backdrop detailing the nature of the performance inadequacies. Here, the Plaintiff claims that while the School has made a number of generalizations, its brief is short on specifics.

The Plaintiff alleges, however, that the allegations the Defendant makes show there is a classic factual dispute between the parties. Specifically, the School maintains that Ms. Burke immediately addressed with the Plaintiff any complaint by a parent about her. The Plaintiff disputes this claim and says that Ms. Burke never advised her of any complaints. The Plaintiff claims this is true of all of the other generalizations offered in support of the School's summary judgment motion. These issues were not brought to her attention. Accordingly, the

Plaintiff alleges that this factual dispute precludes the entry of summary judgment in favor of the School.

In its reply brief, the School labels as "preposterous" the Plaintiff's assertion that its motion contains only generalities. The School notes that it identified over 300 facts extracted from hundreds of pages of documents and deposition testimony, most of which the Plaintiff admitted. In contrast, the School claims that the Plaintiff relies only on her self-serving affidavit.

The Defendant further contends that in many instances in which the Plaintiff purports to deny its alleged undisputed material facts, her attempts fall short. Whether failing to cite any part of the record to challenge the School's reasons not to offer a contract or simply denying a fact on the basis that the principal never informed her of an issue, the Plaintiff has failed to adequately dispute many of the School's alleged undisputed material facts. See Mills v. First Federal Savings and Loan Ass'n of Belvidere, 83 F.3d 833, 844 (7th Cir. 1996) (noting that it is the decision maker's perception of the employee and not the employee's perception of herself which is relevant). The court in Mills also noted that while the nonmoving party's affidavit

57

could sometimes constitute affirmative evidence to defeat a summary judgment motion, conclusory statements by the employee do not create an issue of fact.  Id. at 843; see also Dey v. Colt Const. & Development Co., 28 F.3d 1446, 1460 (7th Cir. 1994) ("An employee's self-serving statements about his ability . . . are insufficient to contradict an employer's negative assessment of that ability.") (quotation omitted).

The School alleges, moreover, that the Plaintiff failed a number of times to respond to the fact stated.  Specifically, when the School pointed to evidence that others smelled alcohol on the Plaintiff's breath, she responded, "Woken denies that any time she was under the influence of alcohol while teaching." Consequently, she did not deny that others smelled alcohol on her breath, so she admitted that fact.

The School further claims that the Plaintiff also failed to adequately respond to the alleged fact that parents complained about her.  Instead of admitting or denying this allegation, the Plaintiff stated that she needed more information to respond.  The School asserts that such a response does not create an issue of fact and the time for discovery has long since passed.

Moreover, counsel for the Plaintiff took the depositions of the very people she claims did not provide enough information for her to respond. Additionally, the School notes that it produced a large number of documents in discovery, none of which the Plaintiff references in her response. The School contends that summary judgment is not a discovery tool, and the Plaintiff's responses do not adequately create factual disputes. The Plaintiff cannot create a factual dispute by simply denying a statement or stating that she was performing well.

After viewing the facts in the light most favorable to the Plaintiff, the Court concludes that Plaintiff is unable to demonstrate a *prima facie* case under the ADEA because she cannot show she was performing according to the School's legitimate expectations. Accordingly, the Defendant is entitled to summary judgment.

The undisputed facts show that there were problems with the Plaintiff's performance as far back as the 1999-2000 school year. The Plaintiff acknowledges her evaluation that year indicated she "needs improvement" on 20 out of 55 items. Moreover, while the Plaintiff

consistently denies that she was under the influence of alcohol while teaching, she admits to meeting on May 3, 2000 with Ms. Burke and the Parish Pastor, Father Patrick Render, to discuss performance issues, her noticeable odor of alcohol and to place the Plaintiff on a remediation plan for the following year.

The Plaintiff's evaluations for the 2000-01 school year also did not meet the School's legitimate expectations. The Plaintiff acknowledges that she was evaluated as "Unsatisfactory/Needs Improvement" in a number of categories; she states only that she did not agree with those assessments. Moreover, the Plaintiff does not dispute that students complained to Ms. Hansen about her; she states only that this is impossible to respond to because the School does not identify who complained.

It is undisputed that there were problems with the Plaintiff's performance during the 2001-02 school year. While multiple members of the faculty and staff observed an odor of alcohol and other possible indicators of alcohol consumption, the Plaintiff states only that she denies ever being under the influence of alcohol while teaching. The Court

60

concludes that the incident of February 14, 2002 is particularly probative. Late that morning, several school officials reported smelling an odor of alcohol on the Plaintiff.  They also observed that the Plaintiff had bloodshot eyes and hand tremors.  The Plaintiff again denies ever being under the influence of alcohol while teaching.  She admits, however, that she was asked to leave school for the day.  Significantly, the Plaintiff does not provide any alternative explanation why Ms. Burke sent her home that day. The Plaintiff also admits that after the February 14, 2002 incident, Parish Pastor Father Dan Nolan told Ms. Burke that the Plaintiff must get an alcohol assessment.  Such a request would seem to be most unusual unless the Plaintiff was drinking that day.  Consequently, the Plaintiff's conclusory statement that she was never under the influence of alcohol while teaching is not particularly persuasive.

The Plaintiff further acknowledges Father Nolan instructed her to get an alcohol evaluation and provided her with a choice of programs.  Father Nolan told her that the school would pay for the assessment and that it would make a decision regarding further action following the assessment.

The Plaintiff admits that Ms. Burke and Father Nolan also informed her that she must follow any recommendations for treatment stated in the evaluation.  She further acknowledges receiving the alcohol evaluation on March 20, 2002.  It was recommended that she attend individual treatment sessions for several months.  The Court concludes that these facts, which the Plaintiff admits, significantly bolster the School's account of what transpired on February 14, 2002.[16]  The Plaintiff's conclusory statement denying she was under the influence of alcohol while teaching does not create a factual dispute on the issue.

The Plaintiff acknowledges that the contract for the 2002-03 school year included a remediation plan.  She admits that the contract attachment required that she not come to the school under the influence of alcohol or with any type of residual odor of alcohol.  The Plaintiff does not say why such a provision would be included in her contract if there were no previous

---

[16]Of course, the Plaintiff does not admit to all of the School's alleged undisputed facts concerning this incident.  The School asserts that following the incident, "Ms. Burke and Father Nolan met with plaintiff regarding the incident, and plaintiff apologized; said she understands why she was sent home; and said she had too much to drink."  In response to that alleged undisputed fact, the Plaintiff simply "denies that at any time she was under the influence of alcohol while teaching."  That is not particularly responsive to the allegations.

problems with alcohol.  This further supports the School's allegations regarding the Plaintiff sometimes coming to work with an odor of alcohol on her breath.  The Plaintiff's familiar response is simply not credible.  It is also often not directly responsive to the Defendant's allegations.

The Plaintiff admits that she could be terminated for failing to meet the terms of the contract and its attachment.  The Plaintiff also acknowledges that in evaluating her for the 2001-02 school year, Ms. Burke identified concerns with her performance besides alcohol abuse.  One such problem was the Plaintiff's failure to send newsletters to parents on a bi-monthly basis, in violation of school policy.

In a conclusory fashion, the Plaintiff does dispute many of the School's allegations relating to her performance during the 2002-03 school year.  Specifically, she disputes many of the allegations concerning classroom management and safety concerns, such as failing to supervise her students and leaving the classroom unattended.  The Plaintiff does admit to a heavy reliance on worksheets as a method of instruction.

The School also alleges it received a number of complaints about the

Plaintiff from parents and students.  These complaints pertained to a number of different issues, including education and instruction as well as discipline and safety.  The Plaintiff disputes these complaints on the basis that it is impossible to respond because the School has not identified the facts surrounding the alleged complaints.  She further claims that contrary to the School's allegations, Ms. Burke did not address these complaints with her.

The Plaintiff also disputes the School's allegations regarding her failure to communicate with parents and students.  The Plaintiff does acknowledge, however, that although teachers are supposed to attend extracurricular activities and parent club meetings, she did not attend any such events during the 2002-03 school year.  The Plaintiff also admits that although teachers were required to send bi-monthly newsletters home to parents so that they could be involved in their children's education, she did not send bi-monthly newsletters home during that school year.

The Plaintiff admits that during the 2002-03 school year, Ms. Burke prepared contemporaneous notes regarding incidents or observations of

Plaintiff, and that these notes reflect that students also complained to Ms. Burke that Plaintiff did not consistently enforce rules in the classroom. In March 2003, moreover, the Plaintiff acknowledges that she did not contact a parent after one of her students received seven discipline tickets, even after the parent sent a note to Plaintiff. The Plaintiff admits that she relied on another teacher to discuss the problem with the parent, even though it is the individual teacher's responsibility to contact the parent when the teacher is having a problem with that parent's child.

The Plaintiff also acknowledges that a teacher must respect the confidentiality of personal and restricted information regarding students, be sensitive to the needs of her students, and maintain a high degree of personal conduct and good judgment. Some of the statements that she admits to making, including a comment about a student while in the presence of Ms. Burke, another student and her parent, are inconsistent with these requirements.

The Plaintiff also admits that during the 2002-03 school year, she failed to plan field trips or the picnic for her class. When asked why she

65

would not take her students to Cahokia Mounds, the Plaintiff stated that she could not control her students.

The Plaintiff acknowledges that there were issues with her professional development in 2002-03. She admits that as of May 1, 2003, she was not even close to half way to obtaining the 120 units to renew her teaching certificate.

The School makes several allegations about issues related to alcohol during the 2002-03 school year. It claims that on December 17, 2002 and February 20, 2003, Ms. Hansen noticed a strong odor of alcohol on the Plaintiff. Pat Florent also reported to Ms. Burke that she noticed a strong odor of alcohol on February 20. The Plaintiff disputes each of these allegations by simply denying that she was ever under the influence of alcohol while at school. As the School contends, however, this denial does not contradict the School's assertion that other employees smelled alcohol on her breath and observed other symptoms–such as a very loud voice and the appearance of being out of control--which might be consistent with

66

alcohol consumption.[17]

Moreover, the Plaintiff's statement denying that she came to work under the influence of alcohol, which is her response to School's statements of undisputed facts numbered 219 through 233, is non-responsive to many of the allegations, as the Court has previously stated.  Specifically on February 20, 2003, one of the days on which school employees smelled an odor of alcohol on the Plaintiff's breath, Ms. Hansen heard Plaintiff in the hallway yelling at the students to "sit down;" "get out of here;" and "shut up."  This occurred following a fight between students on the playground.  The Plaintiff does not remember this incident on the playground or outside the school office in the hallway.  The Plaintiff's statement that she was not under the influence of alcohol does not respond to the Defendant's allegations.

---

[17]Moreover, it is unclear exactly what the Plaintiff means when she says she was never under the influence of alcohol, which is her consistent response to each allegation that pertains to alcohol and some allegations that have nothing to do with alcohol.  For example, such a statement might be interpreted to mean that she never came to school intoxicated to such an extent that she would have been legally prohibited from operating a motor vehicle.  However, the contract attachment for the 2002-03 school year provided that the Plaintiff was not to come to school with any type of residual odor of alcohol.  The Plaintiff does not address whether she ever came to school with a residual odor of alcohol.

Another allegation that the Plaintiff does not adequately respond to is that at Plaintiff's request, Ms. Hansen took control of Plaintiff's classroom and sat in with Plaintiff and her class for the remainder of the day.  Moreover, the School claims that Ms. Burke met with the Plaintiff to discuss this incident the day after it occurred; she told the Plaintiff that Ms. Hansen and Ms. Florent reported noticing a strong odor of alcohol.  The Plaintiff did not deny this or offer an explanation.  Additionally, the School claims that after the February 20, 2003 incident, Ms. Burke spoke with Father Holinga and told him about the Plaintiff's conduct and the odor of alcohol.  The Plaintiff's denial that she was ever under the influence of alcohol while at work does not directly respond to many of these allegations.  Accordingly, the Court concludes that Plaintiff has admitted the allegations.

Even when viewing the allegations in the light most favorable to the Plaintiff, the Court is unable to conclude that the Plaintiff was performing her job satisfactorily.  The School alleges that the final decision not to offer the Plaintiff a contract was made for the following reasons: (1) Plaintiff did not fulfill the contract remediation plans and because Father Holinga was

68

concerned for the safety of the children; (2) Plaintiff's alcohol use; (3) the parents of 12 out of 23 students complained, and some complaints were about the children's safety; and (4) the next year's eighth grade class was significantly larger than the 2002-03 class. The Plaintiff disputes these facts simply on the basis that the reasons for her discharge are the ultimate issue in this case. However, she has failed to create a genuine issue of material fact.

It is clear from the foregoing that the Plaintiff was not performing her job satisfactorily. The undisputed facts demonstrate that she was not following the remediation plan in all respects and that there was a legitimate basis to be concerned for the children. Despite the Plaintiff's conclusory denials, moreover, it is apparent that her alcohol use remained a problem in 2002-03. As for the complaints, the Plaintiff denies only that they were brought to her attention; she does not deny that there were a significant number of complaints by parents.

Finally, the Plaintiff admitted that she could not control her eighth grade class in 2002-03, so the fact that the following year's class would be

larger would seem to be a legitimate concern.  Accordingly, this is another reason why the Court must conclude that even when viewing the facts in the light most favorable to the Plaintiff, there is no genuine issue of material fact that the Plaintiff was not performing her job satisfactorily.

### III. CONCLUSION

The Court concludes that the Plaintiff cannot allege a *prima facie* case. Even when the facts are viewed in the light most favorable to the Plaintiff, she is unable to create a genuine issue of material fact regarding whether she was performing her job satisfactorily.  Accordingly, the Court will ALLOW the Defendant's motion for summary judgment.

Having determined that the Plaintiff has failed to create a factual issue on whether she was meeting the School's legitimate expectations, the Court need not thoroughly address whether younger, similarly situated employees were treated more favorably than the Plaintiff.[18]  However, an examination of the Plaintiff's response to the Defendant's summary judgment motion reveals that she also failed to create a genuine issue of material fact on this

---

[18]Moreover, the Court need not proceed to the subsequent steps in the burden-shifting framework of <u>McDonnell Douglas</u> and its progeny.

70

issue.  The Plaintiff argues that she should be compared with all teachers, not simply those who taught the sixth through eighth grades.  She claims that she was subjected to harsher standards than her younger co-workers.  However, the Plaintiff has not alleged that any teacher at St. Joseph's engaged in similar conduct and was treated more favorably.  Even if the Plaintiff could establish that she performed her job satisfactorily, therefore, she would still be unable to allege a *prima facie* case of age discrimination pursuant to the ADEA.

Ergo, the Defendant's motion for summary judgment [d/e 18] is ALLOWED.  The Clerk will enter judgment in favor of the Defendant and against the Plaintiff.

ENTER: May 15, 2006

FOR THE COURT:

s/Richard Mills
United States District Judge

71